# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| SAMUEL SUTTON, individually and on behalf of all others similarly situated,<br><br>　　Plaintiff,<br><br>v.<br><br>NEIGHBORS CREDIT UNION,<br><br>　　Defendant. | Case No.<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff Samuel Sutton ("Plaintiff"), individually, and on behalf of all others similarly situated (collectively, "Class members"), by and through his attorneys, brings this Class Action Complaint against Defendant Neighbors Credit Union ("NCU" or "Defendant"), and complains and alleges upon personal knowledge as to himself and information and belief as to all other matters.

## INTRODUCTION

1.　　Plaintiff brings this class action against NCU for its failure to secure and safeguard the personally identifying information ("PII") of Plaintiff and Class members, including at least names, Social Security numbers, financial account information, driver's license information, and credit/debit card information.

2.　　NCU is a credit union based in St. Louis, Missouri, with locations throughout the St. Louis metropolitan area.

3.　　Between approximately September 20, 2024 and September 21, 2024, NCU detected that an unauthorized third party had gained access to NCU's network systems and

obtained files containing the PII of NCU's current and former members, including Plaintiff (the "Data Breach").

4. NCU owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII against unauthorized access and disclosure. NCU breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect its current and former members' PII from unauthorized access and disclosure.

5. As a result of NCU's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of himself and all persons whose PII was exposed as a result of the Data Breach, which occurred between approximately September 20, 2024 and September 21, 2024.

6. Plaintiff, on behalf of himself and all other Class members, asserts claims for negligence, negligence per se, breach of implied contract, unjust enrichment, and violations of the Missouri Merchandising Practices Act, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

*Plaintiff Samuel Sutton*

7. Plaintiff Samuel Sutton is a citizen of Missouri.

8. Plaintiff is a member of NCU. As a condition of providing financial services to Plaintiff, NCU required Plaintiff to provide it with his PII.

9. Plaintiff believed NCU had implemented and maintained reasonable security and practices to protect his PII. With this belief in mind, Plaintiff provided his PII to NCU in connection with obtaining financial services from NCU.

10. At all relevant times, NCU stored and maintained Plaintiff's PII on its network systems, including the systems accessed in the Data Breach.

11. Had Plaintiff known that NCU does not adequately protect the PII in its possession, he would not have obtained financial services from NCU or agreed to entrust it with his PII.

12. As a direct result of the Data Breach, Plaintiff has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII; and deprivation of the value of his PII.

***Defendant Neighbors Credit Union***

13. Defendant Neighbors Credit Union is a Missouri credit union with its principal place of business located at 6300 S. Lindbergh Blvd., St. Louis, MO 63123.

## JURISDICTION AND VENUE

14. The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

15. This Court has general personal jurisdiction over NCU because it maintains its principal place of business in this District.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because NCU's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of NCU and the Data Breach*

17. NCU is a credit union that was formed on March 16, 1928 in St. Louis, Missouri.[1] The company now claims to be "one of the largest and strongest credit unions in Missouri."[2]

18. In the regular course of its business, NCU collects and maintains the PII of its members, including Plaintiff and Class members.

19. NCU's website contains a Privacy Policy that applies to those who provide their PII to NCU.[3] NCU claims in its Privacy Policy that it uses "security measures that comply with federal law."[4]

20. NCU's website also contains a page entitled "Our Security Standards," which opens with, "Neighbors Credit Union is dedicated to protecting the privacy of our members and protecting against fraud."[5] The page claims that NCU takes steps and precautions to ensure that Plaintiff's and Class members' PII is secure.[6]

21. Between approximately September 20, 2024 and September 21, 2024, an unauthorized third party had access to NCU's network systems.[7] NCU determined that the unauthorized third party "acquired certain files" from its systems.[8] NCU reported to the

---

[1] *About Neighbors Credit Union*, NEIGHBORS CREDIT UNION, https://www.neighborscu.org/home/about/difference (last accessed May 22, 2025).
[2] *Id*.
[3] *Privacy Policy*, NEIGHBORS CREDIT UNION, https://www.neighborscu.org/home/fiFiles/static/documents/PrivacyPolicy.pdf (last accessed May 22, 2025).
[4] *Id*.
[5] *Our Security Standards*, NEIGHBORS CREDIT UNION, https://www.neighborscu.org/home/security/standards (last accessed May 22, 2025).
[6] *Id*.
[7] *Notice of Data Breach*, MASS.GOV, https://www.mass.gov/doc/2025-805-neighbors-credit-union/download (last accessed May 22, 2025).
[8] *Id*.

4

Massachusetts Office of Consumer Affairs and Business Regulation that the Data Breach affected Social Security numbers, financial account information, driver's license information, and credit/debit card numbers.[9]

22.  While the Data Breach occurred between approximately September 20, 2024 and September 21, 2024, it waited until approximately May 8, 2025, over seven months after the Data Breach occurred, to begin notifying its current and former members that the Data Breach occurred and that their PII was in the hands of cybercriminals.

23.  NCU's failure to promptly notify Plaintiff and Class members that their PII was accessed and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII before Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

### *NCU Knew that Criminals Target PII*

24.  At all relevant times, NCU knew, or should have known, that the PII that it collected and stored was a target for malicious actors. Despite such knowledge, NCU failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII from cyberattacks that it should have anticipated and guarded against.

25.  It is well known among companies that store sensitive personally identifying information that such information—such as the PII stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches

---

[9] *Data Breach Report 2025*, MASS.GOV, https://www.mass.gov/doc/data-breach-report-2025/download (last accessed May 22, 2025).

5

are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[10]

26. PII is a valuable property right.[11] The value of PII as a commodity is measurable.[12] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[13] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[14] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

27. As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security Numbers, PII, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

---

[10] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[11] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[12] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[13] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[14] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

6

28. Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[15]

### Theft of PII Has Grave and Lasting Consequences for Victims

29. Theft of PII can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[16] [17]

30. Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[18]

---

[15] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[16] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed May 22, 2025).

[17] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[18] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

31. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[19]

32. There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[20]

33. It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market.

### *Damages Sustained by Plaintiff and Class Members*

34. Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendant's possession; and (vi) future costs in terms

---

[19] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed May 22, 2025).

[20] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach.

## CLASS ALLEGATIONS

35. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

36. Plaintiff brings this action on behalf of himself and all members of the following Class of similarly situated persons:

> All persons whose personally identifiable information was accessed in the Data Breach by an unauthorized third party, including all who were sent a notice of the Data Breach.

37. Excluded from the Class are Neighbors Credit Union, and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge.

38. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

39. The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. NCU has reported to the Massachusetts Office of Consumer Affairs and Business Regulation that the Data Breach affected approximately 1,727 Massachusetts residents and reported to the Attorney General of Texas that approximately 2,406 Texas residents were affected in the Data Breach.[21]

---

[21] *See Data Breach Report 2025*, *supra* n. 9; *Data Security Breach Reports*, ATTORNEY GENERAL OF TEXAS, https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last accessed May 22, 2025).

40. Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

   a. Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII from unauthorized access and disclosure;

   b. Whether Defendant had a duty not to disclose the PII of Plaintiff and Class members to unauthorized third parties;

   c. Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII;

   d. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiff and Class members;

   e. Whether Defendant breached its duties to protect Plaintiff's and Class members' PII; and

   f. Whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

41. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

42. Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had his PII compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

43. Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that he has no interests adverse to, or that

conflict with, the Class he seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

44. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress from Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

45. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

46. NCU owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting the PII in its possession, custody, or control.

47. NCU knew or should have known the risks of collecting and storing Plaintiff's and all other Class members' PII and the importance of maintaining secure systems. NCU

knew or should have known of the many data breaches that targeted companies that collect and store PII in recent years.

48. Given the nature of NCU's business, the sensitivity and value of the PII it maintains, and the resources at its disposal, NCU should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

49. NCU breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to it—including Plaintiff's and Class members' PII.

50. It was reasonably foreseeable to NCU that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII to unauthorized individuals.

51. But for NCU's negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII would not have been compromised.

52. As a result of NCU's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from

unauthorized use of their PII; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in NCU's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach.

## COUNT II
## NEGLIGENCE PER SE

53. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

54. NCU's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by business, such as NCU, of failing to employ reasonable measures to protect and secure PII.

55. NCU violated Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and other Class members' PII, by failing to provide timely notice, and by not complying with applicable industry standards. NCU's conduct was particularly unreasonable given the nature and amount of PII it obtains and stores, and the foreseeable consequences of a data breach involving PII including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

56. NCU's violation of Section 5 of the FTCA constitutes negligence per se.

57. Plaintiff and Class members are within the class of persons that Section 5 of the FTCA were intended to protect.

58. The harm occurring as a result of the Data Breach is the type of harm that Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement

13

actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiff and Class members as a result of the Data Brach.

59. It was reasonably foreseeable to NCU that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII to unauthorized individuals.

60. The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of NCU's violations of Section 5 of the FTCA. Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in NCU's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach.

## COUNT III
## BREACH OF IMPLIED CONTRACT

61. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

62. In connection with receiving financial services, Plaintiff and all other Class members entered into implied contracts with NCU.

63. Pursuant to these implied contracts, Plaintiff and Class members provided NCU with their PII. In exchange, NCU agreed to, among other things, and Plaintiff understood that NCU would: (1) provide financial services to Plaintiff and Class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII; and (3) protect Plaintiff's and Class members' PII in compliance with federal and state laws and regulations and industry standards. NCU benefitted from receiving Plaintiff's and Class members' PII, as they were able to use it for billing and operational purposes.

64. The protection of PII was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and NCU, on the other hand. Indeed, as set forth *supra*, NCU recognized the importance of data security and the privacy of PII in its Privacy Policy. Had Plaintiff and Class members known that NCU would not adequately protect their PII, they would not have provided their PII to NCU.

65. Plaintiff and Class members performed their obligations under the implied contract when they provided NCU with their PII.

66. NCU breached its obligations under its implied contracts with Plaintiff and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class members' PII in a manner that complies with applicable laws, regulations, and industry standards.

15

67. NCU's breach of its obligations of its implied contracts with Plaintiff and Class members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class members have suffered from the Data Breach.

68. Plaintiff and all other Class members were damaged by NCU's breach of implied contracts because: (i) they provided their PII to NCU in exchange for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII has been breached; (v) they were deprived of the value of their PII, for which there is a well-established national and international market; and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face.

## COUNT IV
## UNJUST ENRICHMENT

69. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

70. This claim is pleaded in the alternative to the breach of implied contract claim.

71. Plaintiff and Class members conferred a monetary benefit upon NCU by creating a financial account with NCU and through the provision of their PII.

72. NCU accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class members. NCU also benefitted from the receipt of Plaintiff's and Class members' PII, as this was used to facilitate services.

73. As a result of NCU's conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data

16

privacy and security practices and procedures that Plaintiff and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

74.   NCU should not be permitted to retain the money belonging to Plaintiff and Class members because NCU failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

75.   Plaintiff and Class members have no adequate remedy at law.

76.   NCU should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

## COUNT V
### VIOLATIONS OF THE MISSOURI MERCHANDISING PRACTICES ACT
### Mo. Rev. Stat. § 407.20 *et seq.* ("MMPA")

77.   Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

78.   NCU offers, and continues to offer, financial services in the State of Missouri.

79.   Plaintiff and other Class members received financial services from NCU for personal, family, or household purposes.

80.   NCU engaged in unlawful and unfair practices in violation of the MMPA by failing to, or contracting with companies that failed to, implement and maintain reasonable security measures to protect and secure their patients' PII in a manner that complied with applicable laws, regulations, and industry standards, including by ensuring the third parties they contract with and share PII with implement and maintain reasonable security measures to protect and secure PII.

81. As a result of the Data Breach, Plaintiff and Class members have lost property in the form of their PII. Further, NCU's failure to adopt reasonable practices in protecting and safeguarding its members' PII will force Plaintiff and other Class members to spend time or money to protect against imminent identity theft.

82. Plaintiff and Class members are now at a higher risk of identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for NCU's practice of collecting and sharing PII with third parties without ensuring those third parties have appropriate and reasonable safeguards in place to protect such information.

83. Plaintiff and all other Class members were damaged by NCU's unfair and deceptive trade practices because: (i) they provided their PII to NCU in exchange for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft—risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII has been breached; (v) they were deprived of the value of their PII, for which there is a well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) overpayment for services that were received without adequate data security.

84. Plaintiff seeks all relief authorized under the MMPA, including attorney's fees and such equitable relief as the Court deems proper to protect Plaintiff and Class members from NCU's unlawful actions as describe herein.

**PRAYER FOR RELIEF**

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in his favor and against Defendant as follows:

A. Certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seek appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiff and the Class such other favorable relief as allowable under law.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: May 22, 2025

Respectfully submitted,

/s/ John S. Steward
John S. Steward #45932MO
**STEWARD LAW FIRM LLC**
14824 West Clayton Road
Suite 24
St. Louis, MO 63017
314-504-0979
Fax: 314-594-5950
Email: js@molawgroup.com

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Tel: 312-621-2000
Fax: 312-641-5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Attorneys for Plaintiff*

*pro hac vice forthcoming